UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| **JDR CABLE SYSTEMS LIMITED**<br>Forvis Mazars Capital Square,<br>58 Morrison Street,<br>Edinburgh, EH3 8BP, Scotland<br><br>　　　　　**Plaintiff,**<br>　　vs.<br><br>**DEME OFFSHORE US, LLC,**<br>1209 Orange Street, Wilmington,<br>Delaware 19801<br><br>Registered Agent Address:<br>Corporation Trust Center<br>1209 Orange St.,<br>Wilmington, Delaware 19801<br><br>　　　　　**Defendant.** | Case No.: 2:26-cv-588 |

## **COMPLAINT**

Plaintiff JDR Cable Systems Limited ("JDR"), by and through its undersigned counsel, hereby files this Complaint against Defendant DEME Offshore US, LLC ("DEME"), and in support thereof alleges as follows:

## **NATURE OF ACTION**

This action arises from DEME's systematic breach of a multi-million-pound subcontract for critical offshore wind infrastructure work. DEME engaged JDR—an internationally recognized expert in subsea cable systems—to perform inter-array cable pull-in, termination, and testing services for the Coastal Virginia Offshore Wind Project (the "Project"), one of the largest offshore wind developments in the United States. Despite JDR's full performance and compliance with its contractual obligations, DEME repeatedly failed to provide required site access and vessel

readiness, withheld essential safety information, unilaterally imposed schedule disruptions, and refused to process or pay JDR's valid claims for time extensions and additional costs arising directly from DEME's own failures. DEME's conduct has caused JDR to incur millions of pounds in unreimbursed costs for standby periods, mobilization delays, extended campaign execution, and disruption—while DEME has unjustly retained the full benefit of JDR's work. When JDR properly submitted claims under the Subcontract's Change Order mechanism, DEME either rejected them outright without reasoned determinations or simply failed to respond within the required contractual timeframes. DEME has now compounded its breaches by unilaterally purporting to remove scope from JDR's Subcontract without following the contractually mandated change procedures. JDR brings this action to recover the substantial damages it has suffered as a direct result of DEME's material breaches of contract.

## **PARTIES**

1.      Plaintiff JDR Cable Systems Limited is a company duly incorporated under the laws of Scotland, and located at Forvis Mazars Capital Square, 58 Morrison Street, Edinburgh, EH3 8BP, Scotland, registered in Scotland under number SC186794, with operational offices at Victoria Dock, Greenland Road, Hartlepool, TS24 0RQ, England.

2.      Upon information and belief, Defendant DEME Offshore US, LLC is a Delaware limited liability company, located at 1209 Orange Street, Wilmington, New Castle County, Delaware, 19801, with a principal place of business located at 256 Marginal St, Building 36, Suite 2, East Boston, Massachusetts, 02128. Upon information and belief, no member of DEME Offshore US, LLC is a citizen of Scotland or the United Kingdom.

3. Upon information and belief, DEME conducts substantial business in the Commonwealth of Virginia in connection with the Project, which is located off the coast of Virginia.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because this is a civil action between a citizen of a foreign state and a citizen of a State of the United States, and the amount in controversy exceeds $75,000, exclusive of interest and costs, insofar as JDR's claims total £9,545,622.00 exclusive of interest and costs.

5. JDR is a citizen of the United Kingdom, Scotland.

6. DEME is a Delaware limited liability company, with its principal place of business in Massachusetts.

7. This Court has personal jurisdiction over DEME because DEME has consented to the exclusive jurisdiction of state and federal courts in the Commonwealth of Virginia pursuant to Clause 31.3 of the Subcontract. A true and correct copy of the Subcontract is attached hereto as Exhibit 1.

8. Additionally, DEME conducts substantial and continuous business in Virginia in connection with the Project, which is located off the coast of Virginia, and the claims asserted herein arise directly from DEME's performance and breach of a contract to be performed in substantial part in Virginia.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and pursuant to the forum selection clause in Clause 31.3 of the Subcontract.

## FACTUAL BACKGROUND

### A. The Coastal Virginia Offshore Wind Project

10.     Virginia Electric and Power Company ("Owner" or "VEPC") owns and is developing an offshore wind farm off the coast of Virginia in an area leased from the U.S. Department of Interior's Bureau of Ocean Energy Management.

11.     VEPC appointed the consortium of DEME, Prysmian Cables ("Prysmian"), and Systems USA, LLC ("SUL", together with DEME and Prysmian the "EPCI-Contractor") as the EPCI-Contractor for the balance of plant engineering, procurement, transportation, and installation services for the Project.

12.     On November 4, 2021, the EPCI-Contractor and VEPC entered into a contract for the balance of plant engineering, procurement, transportation, and installation services for the Project (the "Prime Contract").

13.     Thereafter, on May 7, 2024, DEME, as Contractor, and JDR, as Subcontractor, entered into a Subcontract for Inter Array Cables (IAC) Pull-In and Termination and Testing Scope for the Coastal Virginia Offshore Wind Project (the "Subcontract"), whereby JDR would furnish pull-in, termination, and testing services for inter-array cables to the Project.

14.     The Subcontract is governed by Virginia law. Clause 31.3 provides:

> This Subcontract … shall be governed by and construed and enforced in accordance with the internal Laws and Codes of the Commonwealth of Virginia, without regard to its principles of conflict of laws, and all claims relating to or arising out of this Subcontract, or the breach thereof, whether sounding in contract, tort, or otherwise, shall likewise be governed by the laws of the Commonwealth of Virginia, without regard to its principles of conflict of laws.

15.     To the same effect, Clause 2.15 provides that the Subcontract "and any disputes arising out of or in connection therewith, shall be governed, construed, and interpreted by and in accordance with the laws of the Commonwealth of Virginia."

16.    The parties further agreed to a forum-selection provision in Clause 31.3:

All judicial actions or proceedings brought against any Party with respect to this Subcontract shall be brought in any state or federal court of competent jurisdiction in the Commonwealth of Virginia, provided, however, if a federal court in the Eastern District of the Commonwealth of Virginia has and accepts jurisdiction over the matter at issue, the judicial action or proceeding shall be brought in such federal court.

17.    The Subcontract Price is a fixed lump sum of GBP 13,369,993.00, not subject to adjustment except as expressly provided for in the Subcontract.

**B.  The Scope of JDR's Work and Its Dependence on DEME**

18.    The Subcontract defines JDR's scope of work—the "Termination and Testing Services" or "Works." Clause 1.87 provides:

"Works" or "Scope of Works" or "Subcontract Works" or also "Termination and Testing Services" and "Cable Pull-in Services" means the pull-in services, termination services of the Free Issued Materials (such as Cables and Accessories), testing services and other works and services to be performed by the Subcontractor under or in relation to the Subcontract.

19.    JDR's scope of works is more fully articulated in Schedule 2 to the Subcontract, which describes the services to be furnished by JDR related to the 66 kV Inter Array Cables (IAC) Systems.

20.    By the Subcontract's own design, JDR's performance of the Works depended on DEME.

21.    Under Clause 10.16, the cables and accessories that JDR was to pull in, terminate, and test were "Free Issued Materials" that DEME was obligated to supply; under Clause 16.8.2 JDR's personnel were to perform the offshore Works from DEME's accommodation vessel; and pursuant to Clauses 10.13.2, and 16.5, JDR's access to the offshore foundations was controlled by DEME and sequenced to DEME's installation campaign.

22.    Indeed, Clause 16.5 expressly reserves to DEME the right to direct the sequence of JDR's Works:

> Due to the dynamic nature of the offshore installation campaign conducted by the EPCI-Contractor, the Subcontractor hereby acknowledges its flexibility within this Subcontract to adapt the performance of the Termination and Testing Services to a different sequence than initially planned. This flexibility may include altering the sequence or order of offshore foundations within a string and/or altering the sequence of different strings, altering the number of campaign(s) ….

## C. DEME's Obligations to JDR

23.    DEME assumed affirmative obligations to enable and support JDR's performance of the Works.

24.    Clause 10.2 provides:

> The Contractor shall provide the Subcontractor with all assistance reasonably required by the Subcontractor in performing its obligations hereunder, including (but not limited to) providing any information or documents required by the Subcontractor to execute the Termination and Testing Services or to demonstrate compliance of the Works with this Subcontract. Such assistance provided by the Contractor, or lack thereof, shall not relieve the Subcontractor of its responsibilities and obligations under the Subcontract.

25.    DEME was obligated to provide JDR with access to the Offshore Site in accordance with the Programme. Clause 10.13.2 provides:

> The Contractor shall give the Subcontractor a non-exclusive right of access to the Offshore Site (or part thereof), as required for the good and proper performance of the Termination and Testing Services and the remedying of Defects (if any), in accordance with: (a) the Programme (refer Schedule 3 [Programme and Liquidated Damages]); (b) requirements and restrictions by applicable Laws; (c) requirement and limitations / restrictions specified in the Subcontract; (d) the requirement and/or instructions of the Contractor; (e) any other requirements and restrictions by the Employer, the Marine Coordinator or public authorities.

26.    DEME was responsible for the accuracy of the information it provided to JDR. Clause 4 [Rely-Upon Information] provides at Clause 4.1 that "[t]he Subcontractor acknowledges and accepts that the Contractor has provided the necessary requirements to the Subcontractor to

enable the Subcontractor to perform and execute the Termination and Testing Services in accordance with the Subcontract," and confirms at Clause 4.3 that JDR's duty to review such information does not shift responsibility for errors in it:

> … For the avoidance of doubt, the above provision does not make the Subcontractor liable for errors in Contractor's documents, which will remain Contractor's liability. This provision only caters for the review and checking by Subcontractor of any errors, etc. in such Contractor's documents.

27.    Under Schedule 3, Section 2, of the Subcontract, DEME was required to issue staged notifications to JDR prior to commencement of the Scope of Works for each campaign, including a first notification (three months prior), a second notification (forty-five days before the first window), and a third notification (twenty-one days prior, confirming the exact commencement date).

28.    Pursuant to Clause 3.4 of Schedule 2 to the Subcontract, DEME is obligated to provide vessels to transport JDR personnel to the Project site.  Specifically,

> Contractor shall make available one (1) ISV (installation support vessel) and optionally one (1) Crew Transfer Vessel (CTV) for offshore transportation from the mobilization port to the offshore site(s) and for transportation between the WTG foundations and OSS and vice versa.

29.    The availability of vessels is critical to JDR's work because JDR's personnel cannot access the offshore site to perform the Termination and Testing Services without DEME-provided transportation.

30.    Under Clause 28 of the Subcontract, DEME was required to issue Change Orders for variations to the Works, including additional time and compensation where delays arose from Contractor-caused events or constraints.

31.    Under Clause 21 of the Subcontract, DEME was required to issue reasoned determinations in response to JDR's claims within the contractual timeframes prescribed therein.

**D. Commencement, the Programme, and the Time for Completion**

32.    Upon commencement, JDR was required to proceed with the Works diligently and in accordance with the Programme.

33.    Clause 16.3 provides:

Upon the Commencement Date, and taking into consideration the above provisions, the Subcontractor shall proceed with the Termination and Testing Services with due expedition and without delay, all in accordance with the period and principles as stated in Schedule 3.

34.    JDR was required to complete each Programme Key Milestone by its corresponding Programme Key Milestone Date.

35.    Clause 16.4 provides, in relevant part, that "[t]he Subcontractor shall complete each and every Programme Key Milestone by its respective Programme Key Milestone Date as stated in Schedule 3 [Programme and Liquidated Damages]."

36.    The Subcontract expressly contemplated that the offshore installation campaign would be dynamic and that DEME might direct changes to the sequence or number of campaigns; it correspondingly allocated to JDR the right to additional time and additional compensation where such DEME-directed changes affected work JDR had already commenced.

37.    Clause 16.6 provides, in relevant part:

(b) In the event of Contractor instructing a change in the sequence of foundations/cables ends within the same string for which Subcontractor has already commenced its Termination and Testing Services, Subcontractor shall be - subject to the provisions outlined in Clause 28 (Change Orders) - entitled to additional compensation or and additional time (meaning any extensions of the time for completion of a Programme Key Milestone Date).

(c) In the event of Contractor instructing a change in the number of campaign(s), Subcontractor shall be - subject to the provisions outlined in Clause 28 (Change Orders) - entitled to additional compensation and additional time (meaning additional time for completion of a Programme Key Milestone Date).

38. The baseline schedule for the Works is the Programme enclosed to Schedule 3.

39. Clause 16.7 provides that "[t]he initial Subcontractor's Programme is enclosed to Schedule 3 [Programme and Liquidated Damages]," and that, within twenty-one (21) Days of the Effective Date, JDR was to submit a detailed, resource-loaded programme (the "Baseline Programme") that "shall form the baseline of the Works."

### E. JDR's Contractual Right to Additional Time and Compensation for Contractor-Caused Delay

40. The Subcontract expressly addresses delays caused by DEME and VEPC and prescribes the mechanism — the issuance of a Change Order — by which JDR is entitled to an adjustment of the Programme (additional time) and of the Subcontract Price (additional compensation) on account of such delays.

41. Clause 28.1 provides, in relevant part:

Change Orders: Generally. Contractor, without invalidating this Subcontract, may order changes to the Works that may result in changes to the Subcontract Price or Programme (and Programme Key Milestone Dates), or other applicable provisions of the Contract through the issuance of a Change Order. …

42. Clause 28 prescribes the procedure by which JDR requests a Change Order.

43. Clause 28.2 provides, in relevant part:

Subcontractor Requests for a Change Order. If Subcontractor believes that it is entitled to a Change Order, Subcontractor shall give Contractor notice within seven (7) Days after Subcontractor knows or should have reasonably known of the occurrence of the event giving rise to such request. Within twenty (20) Days after the delivery of such initial notice … Subcontractor shall provide Contractor with an appropriate statement setting forth the reasons why Subcontractor believes additional compensation or additional time should be granted, the detailed nature of any costs to be incurred, including reasonable adjustments to other applicable Subcontract provisions, and the probable length of any delay in performance of the Work.

44. Most directly relevant to this action, Clause 28.3.1 concerns JDR's entitlement to a Change Order for delays caused by DEME or VEPC, and provides:

Change Order for Contractor-Caused Delays.

To the extent:

(a) (i) there is a delay or suspension in the performance of the Works caused by Contractor, Employer or any of their respective Personnel (including the Marine Warranty Surveyor hired by Employer), (ii) there is an error or change in the Rely Upon Information, or (iii) an event for which Subcontractor is expressly entitled to seek a Change Order according to any other provisions of the Subcontract occurs;

(b) Subcontractor demonstrates that the Works slips from the critical path of the Programme so that achievement of a Programme Key Milestone by its required Programme Key Milestone Date, may be in jeopardy, in each case as determined by a critical path analysis;

(c) Subcontractor demonstrates the extent to which such Programme / schedule impact is caused by Contractor or Employer, and not due to the acts or omissions of Subcontractor, its Sub-subcontractors or Vendors; and

(d) Subcontractor has complied with the requirements of Clause 28.2 (Subcontractor Requests for a Change Order);

then, Subcontractor shall be entitled to receive a Change Order that adjusts the Subcontract Price and/or Programme on an equitable basis to account for such Contractor caused delay.

45.     In addition, Clause 28.3.3 entitles JDR to a Change Order adjusting the Subcontract Price where DEME's late performance of a "Contractor Activity" delays a dependent JDR activity, even off the critical path, and provides:

Change Order Non-Critical Path Contractor-Caused Delay.

To the extent:

(a) There is a delay in performance of a Contractor activity as shown on the Programme ("Contractor Activity");

(b) Subcontractor demonstrates such delay in the Contractor Activity delays the performance of a Subcontractor activity dependent on the performance of such Contractor Activity on the Programme;

(c) Subcontractor demonstrates that the delay in the Contractor Activity was not due to the acts or omissions of Subcontractor, its Sub-subcontractors or Vendors; and

(d) Subcontractor has complied with the requirements of Clause 28.2 (Subcontractor Requests for a Change Order);

then, Subcontractor shall be entitled to receive a Change Order that only adjusts the Subcontract Price on an equitable basis to account for the delay in such Contractor Activity.

46.    Where the parties agreed that an adjustment was due but disagreed on amount, DEME was required to issue a provisional Change Order reflecting its own good-faith estimate, and either party could refer the dispute for resolution under Clause 31 (Clause 28.5.3).

47.    Any amount later determined to be due JDR "shall be paid by Contractor promptly after such determination is made" (Subcontract, Clause 28.5.5).

48.    The Subcontract also entitles JDR to a Change Order adjusting the Programme and/or the Subcontract Price for periods of claimable downtime arising from circumstances beyond its reasonable control.

49.    Clause 16.7.3 provides, in relevant part:

If Subcontractor suffers delay as a result of Adverse Weather, or other circumstances beyond Subcontractor's reasonable control including without limitation, drills, crew changes and vessel breakdowns, or some other unforeseeable and unplanned event which prevent safe working or safe transfer offshore, Subcontractor shall give notice to the Contractor and Subcontractor shall be entitled - subject to compliance with the provisions under Clause 28.3.4 - on a pro-rated basis, for each day (or part thereof) of claimable downtime to a Change Order adjusting (i) the Programme and Programme Key Milestone Date, and (ii) the Subcontract Price based on the rates in Annex 5.1 Bill of Quantities (BOQ) of Schedule 5 (Remuneration).

50.    Finally, Clause 28 further governs the parties' conduct pending resolution of a Change Order request.

51.    JDR was required to continue performing notwithstanding any dispute over its entitlement, and DEME was obligated to pay amounts ultimately determined to be due.

52.    Clause 28.5.2 provides that, "[i]f Subcontractor and Contractor are unable to agree upon a mutually acceptable Change Order … Subcontractor shall continue performance of the Works notwithstanding such dispute, unless otherwise directed by Contractor in writing."

53.    Clause 28.5.5 provides:

> Payment after Resolution. Any amount withheld by Contractor pursuant to this Clause 28.5 that is subsequently determined by dispute resolution pursuant to Clause 31 (Dispute Resolution) to have been properly due Subcontractor shall be paid by Contractor promptly after such determination is made. …

## F. DEME's Payment Obligations

54.    DEME was obligated to certify and to pay amounts due to JDR within defined periods. Clause 21.6 provides, in relevant part, that "[t]he Contractor shall, within thirty (30) Days after receiving a statement and supporting documents, issue to the Subcontractor an interim payment certificate ('Interim Payment Certificate') which shall state the amount the Contractor fairly determines to be due, with supporting particulars."

55. Clause 21.8 provides:

> The Contractor shall pay the amount due to the Subcontractor within forty-five (45) Days of the date as stated on the respective correctly prepared invoice submitted. … [T]he affected Party shall be entitled to receive interest which shall be payable for late payment of undisputed invoices at Euribor rate plus two percent (2%) from the due date of such undisputed payment until actual payment in full.

## G. Extension of Time Claims

56.    JDR mobilized personnel, equipment, and resources in accordance with the Subcontract and DEME's mobilization instructions.

57.    Campaign 1 was originally budgeted for 85 days of performance, but was ultimately extended to 337 days.

58. JDR submitted regular Daily Progress Reports, Weekly Progress Reports, and Monthly Progress Reports detailing constraints, operational conditions, and recovery planning throughout Campaign 1.

59. JDR's planning was issued as part of a 3-day look-ahead within the JDR Daily Progress Report to all key stakeholders.

60. At no time prior to the payment disputes did DEME challenge JDR's planning or Daily Progress Reports.

61. From on or about 9 June 2025 through 17 May 2026, JDR submitted a total of forty-nine (49) formal Extension of Time ("EOT") claims to DEME in connection with JDR's offshore works on the Project.

62. JDR's Claims arise from material impacts to its work resulting from Contractor-controlled events, including but not limited to: DEME's repeated failure to provide JDR with timely access to the ISV, HOS Blackfoot, and inefficiencies arising therefrom; altered campaign sequencing; changing execution priorities; restricted work front access; marine logistical constraints; vessel and accommodation limitations; delayed predecessor activities; offshore operational restrictions; mitigation-driven resequencing; standby periods; cumulative disruption arising from repeated Contractor intervention; failure to provide adequate offshore accommodation and bedspace, and functioning equipment — including the Ampelmann system, davit systems, and crew transfer vessels; and personnel transfer restrictions, technical breakdowns, client downtime, and other operational constraints for which DEME bore contractual responsibility.

63. Throughout this period, JDR's personnel, equipment, and resources were fully mobilized and available for deployment, but were consistently prevented from proceeding with

planned operations due to these DEME-controlled constraints, resulting in material losses of productive working time, delay-related inefficiencies, and disruption to JDR's execution of the critical path of the Project.

64.    JDR consistently and repeatedly notified DEME of non-extension-of-time offshore external constraints, Contractor-directed resequencing, changes to campaign strategy, marine spread changes outside of the Subcontract terms, mobilization and demobilization impacts, productivity disruption, and cumulative effects arising from fragmented execution.

65.    Each claim was advanced pursuant to Clause 28 of the Subcontract, which entitles JDR to an Extension of Time and a corresponding adjustment to the Subcontract Price for Contractor-caused delay.

66.    JDR complied with the notice and submission requirements of Clause 28.2, including providing timely initial notice within seven (7) days of each delay event and detailed statements within twenty (20) days thereafter.

67.    In each instance, DEME reviewed the relevant claim, certified and paid only a portion of the amount claimed, and rejected the remaining balance, leaving substantial sums outstanding and unpaid.

68.    The table below sets forth, on a claim-by-claim basis, the relevant weekly period, the nature of the delay events, the EOT entitlement asserted, the total cost claimed, the amount certified and paid by DEME, and the outstanding unpaid balance that JDR maintains remains due and owing.

| EoT Claims | | | | | |
|---|---|---|---|---|---|
| **EoT Claim Week** | **Date From** | **Date To** | **Claim Value** | **Deme Certified and Paid Amount** | **Remaining Balance Due and Owing** |
| **wk 24 - 2025** | 6/9/2025 | 6/15/2025 | £158,343.00 | £74,423.00 | £83,920.00 |
| **wk 25 - 2025** | 6/16/2025 | 6/22/2025 | £139,146.00 | £47,630.00 | £91,516.00 |
| **wk 26 - 2025** | 6/23/2025 | 6/29/2025 | £130,488.00 | £65,987.00 | £64,501.00 |
| **wk 27 - 2025** | 6/30/2025 | 7/6/2025 | £167,800.00 | £101,838.00 | £65,962.00 |
| **wk 28 - 2025** | 7/7/2025 | 7/13/2025 | £214,287.00 | £126,097.00 | £88,190.00 |
| **wk 29 - 2025** | 7/14/2025 | 7/20/2025 | £244,159.00 | £12,648.00 | £231,511.00 |
| **wk 30 - 2025** | 7/21/2025 | 7/27/2025 | £283,036.00 | £72,146.00 | £210,890.00 |
| **wk 31 - 2025** | 7/28/2025 | 8/3/2025 | £312,535.00 | £177,604.00 | £134,931.00 |
| **wk 32 - 2025** | 8/4/2025 | 8/10/2025 | £212,630.00 | £99,033.00 | £113,597.00 |
| **wk 33 - 2025** | 8/11/2025 | 8/17/2025 | £134,383.00 | £21,164.00 | £113,219.00 |
| **wk 34 - 2025** | 8/18/2025 | 8/24/2025 | £292,590.00 | £214,279.00 | £78,311.00 |
| **wk 35 - 2025** | 8/25/2025 | 8/31/2025 | £72,534.00 | £2,417.00 | £70,117.00 |
| **wk 36 - 2025** | 9/1/2025 | 9/7/2025 | £72,340.00 | £24,262.00 | £48,078.00 |
| **wk 37 - 2025** | 9/8/2025 | 9/14/2025 | £225,067.00 | £103,399.00 | £121,668.00 |
| **wk 38 - 2025** | 9/15/2025 | 9/21/2025 | £269,882.00 | £145,541.00 | £124,341.00 |
| **wk 39 - 2025** | 9/22/2025 | 9/28/2025 | £172,097.00 | £116,910.00 | £55,187.00 |
| **wk 40 - 2025** | 9/29/2025 | 10/5/2025 | £313,941.00 | £197,540.00 | £116,401.00 |
| **wk 41 - 2025** | 10/6/2025 | 10/12/2025 | £287,276.00 | £174,296.00 | £112,980.00 |
| **wk 42 - 2025** | 10/13/2025 | 10/19/2025 | £326,472.00 | £255,810.00 | £70,662.00 |
| **wk 43 - 2025** | 10/20/2025 | 10/26/2025 | £99,985.00 | £40,049.00 | £59,936.00 |
| **wk 44 - 2025** | 10/27/2025 | 11/2/2025 | £262,911.00 | £158,623.00 | £104,288.00 |
| **wk 45 - 2025** | 11/3/2025 | 11/9/2025 | £121,375.00 | £55,408.00 | £65,967.00 |
| **wk 46 - 2025** | 11/10/2025 | 11/16/2025 | £184,137.00 | £97,745.00 | £86,392.00 |
| **wk 47 - 2025** | 11/17/2025 | 11/23/2025 | £223,540.00 | £104,964.00 | £118,576.00 |
| **wk 48 - 2025** | 11/24/2025 | 11/30/2025 | £222,368.00 | £73,638.00 | £148,730.00 |
| **wk 49 - 2025** | 12/1/2025 | 12/7/2025 | £244,491.00 | £84,454.00 | £160,037.00 |
| **wk 50 - 2025** | 12/8/2025 | 12/14/2025 | £249,054.00 | £135,025.00 | £114,029.00 |
| **wk 51 - 2025** | 12/15/2025 | 12/21/2025 | £212,271.00 | £115,258.00 | £97,013.00 |
| **wk 52 - 2025** | 12/22/2025 | 12/28/2025 | £258,756.00 | £183,800.00 | £74,956.00 |
| **wk 1 - 2026** | 12/29/2025 | 1/4/2026 | £314,465.00 | £264,564.00 | £49,901.00 |
| **wk 2 - 2026** | 1/5/2026 | 1/11/2026 | £270,927.00 | £184,716.00 | £86,211.00 |
| **wk 3 - 2026** | 1/12/2026 | 1/18/2026 | £132,004.00 | £15,378.00 | £116,626.00 |
| **wk 4 - 2026** | 1/19/2026 | 1/25/2026 | £144,753.00 | £66,657.00 | £78,096.00 |
| **wk 5 - 2026** | 1/26/2026 | 2/1/2026 | £280,864.00 | £200,430.00 | £80,434.00 |
| **wk 6 - 2026** | 2/2/2026 | 2/8/2026 | £219,749.00 | £155,970.00 | £63,779.00 |
| **wk 7 - 2026** | 2/9/2026 | 2/15/2026 | £146,565.00 | £5,383.00 | £141,182.00 |
| **wk 8 - 2026** | 2/16/2026 | 2/22/2026 | £209,973.00 | £96,137.00 | £113,836.00 |
| **wk 9 - 2026** | 2/23/2026 | 3/1/2026 | £130,404.00 | £67,473.00 | £62,931.00 |

| EoT Claims | | | | | |
|---|---|---|---|---|---|
| EoT Claim Week | Date From | Date To | Claim Value | Deme Certified and Paid Amount | Remaining Balance Due and Owing |
| wk 10 - 2026 | 3/2/2026 | 3/8/2026 | £134,409.00 | £13,676.00 | £120,733.00 |
| wk 11 - 2026 | 3/9/2026 | 3/15/2026 | £177,755.00 | £72,519.00 | £105,236.00 |
| wk 12 - 2026 | 3/16/2026 | 3/22/2026 | £263,904.00 | | £263,904.00 |
| wk 13 - 2026 | 3/23/2026 | 3/29/2026 | £117,357.00 | £44,108.00 | £73,249.00 |
| wk 14 - 2026 | 3/30/2026 | 4/5/2026 | £167,879.00 | £38,355.00 | £129,524.00 |
| wk 15 - 2026 | 4/6/2026 | 4/12/2026 | £164,541.00 | £27,734.00 | £136,807.00 |
| wk 16 - 2026 | 4/13/2026 | 4/19/2026 | £154,750.00 | £67,896.00 | £86,854.00 |
| wk 17 - 2026 | 4/20/2026 | 4/26/2026 | £154,463.00 | £47,836.00 | £106,627.00 |
| wk 18 - 2026 | 4/27/2026 | 5/3/2026 | £142,097.00 | | £142,097.00 |
| wk 19 - 2026 | 5/4/2026 | 5/10/2026 | £150,038.00 | | £150,038.00 |
| wk 20 - 2026 | 5/11/2026 | 5/17/2026 | £95,638.00 | | £95,638.00 |
| **Total** | **6/9/2025** | **5/17/2026** | **£9,680,429.00** | **£4,450,820** | **£5,229,609.00** |

## H. Mobilization and Demobilization Claims

69.    In addition to the costs incurred as a result of the delays and disruptions to its offshore work, JDR also incurred significant additional costs for mobilization and demobilization.

70.    JDR submitted timely claims for costs it incurred as a result of Contractor-controlled events related to mobilization and demobilization that can be broken down into two broad groups:

a. Extension of Time ("EoT") mobilization and demobilization claims, comprising approximately 758 individual mobilization/demobilization events occurring between September 2025 and May 2026, with a combined claimed value of approximately £3,125,720; and

b. Non-EoT mobilization and standby claims, comprising 11 discrete claims totaling approximately £1,190,294.00, each arising from specific instances of

Contractor-caused delay to mobilization, vessel unavailability, or operational constraints.

71.    The basis of JDR's claims is that DEME, as Contractor, caused or contributed to repeated delays through its failure to adhere to contractual mobilization protocols, inadequate vessel selection and readiness (including ISV and CLV delays), access restrictions, equipment failures, accommodation constraints, and campaign sequencing decisions that materially disrupted JDR's planned execution of the works. Campaign 1 was originally budgeted at 85 days but extended to 337 days, during which JDR was required to mobilize and demobilize on numerous occasions as a result of Contractor-controlled events.

72.    DEME has evaluated none JDR's mobilization/demobilization claims to date, and the entirety of the claimed amounts remain outstanding and in dispute.

73.    The table below sets out each individual mobilization and demobilization claim, identifying the claim description, period, claimed value, cost basis, and current status of evaluation.

| Mobilization/Demobilization Claims | | | |
|---|---|---|---|
| **Category** | **Claim Value** | **Deme Certified and Paid Amount** | **Remaining Balance Due and Owing** |
| EoT Related - September 2025 | £268,650.00 | £0.00 | £268,650.00 |
| EoT Related - October 2025 | £420,453.00 | £0.00 | £420,453.00 |
| EoT Related - November 2025 | £335,933.00 | £0.00 | £335,933.00 |
| EoT Related - December 2025 | £482,240.00 | £0.00 | £482,240.00 |
| EoT Related - January 2026 | £354,391.00 | £0.00 | £354,391.00 |
| EoT Related - February 2026 | £329,159.00 | £0.00 | £329,159.00 |
| EoT Related - March 2026 | £367,347.00 | £0.00 | £367,347.00 |
| EoT Related - April 2026 | £386,014.00 | £0.00 | £386,014.00 |
| EoT Related - May 2026 | £181,532.00 | £0.00 | £181,532.00 |
| Non-EoT - Confined Space & H2S | £115,000.00 | £0.00 | £115,000.00 |
| Non-EoT - Pull-In Mobilization / Stand-By | £309,978.70 | £0.00 | £309,978.70 |

| Mobilization/Demobilization Claims | | | |
|---|---|---|---|
| Category | Claim Value | Deme Certified and Paid Amount | Remaining Balance Due and Owing |
| Non-EoT - T&T Mobilization / Stand- By | £381,064.19 | £0.00 | £381,064.19 |
| Non-EoT - T&T Stand-by (Partial Mob) | £147,714.75 | £0.00 | £147,714.75 |
| Non-EoT - Norfolk Costs due to ISV Delay | £11,960.00 | £0.00 | £11,960.00 |
| Non-EoT - Norfolk Costs due to Cabin Restrictions | £39,247.00 | £0.00 | £39,247.00 |
| Non-EoT - 2no Additional Flying Kits | £77,778.00 | £0.00 | £77,778.00 |
| Non-EoT - Equipment for Davit T&T Mob | £63,969.00 | £0.00 | £63,969.00 |
| Non-EoT - HSE Rep during Government Suspension | £5,876.18 | £0.00 | £5,876.18 |
| Non-EoT - Impact of delayed mob/demob March 26 | £37,706.46 | £0.00 | £37,706.46 |
| Total | £4,316,013.28 | £0.00 | £4,316,013.28 |

**I.    Total Claims and Amounts in Dispute**

74.    As previously identified above, JDR's claims comprise i) Extension of Time claims, ii) Extension of Time Related Mobilization/Demobilization claims, and iii) Non-EoT Mobilization/Demobilization claims, which can be summarized as follows:

| Category | Total JDR Claim Value | Amount Paid to Date | Remaining Claim Value Sought |
|---|---|---|---|
| Total EoT Claims | £9,680,431.64 | £4,450,822.26 | £5,229,609.00 |
| EoT Related - Mobilization/Demobilization Claims | £3,125,720.09 | £0.00 | £3,125,719.00 |
| Non-EoT - Mobilization/Demobilization Claims | £1,190,294.00 | | £1,190,294.00 |
| Total Claims | £13,996,445.73 | £4,450,822.26 | £9,545,622.00 |

75.    JDR therefore seeks recovery of not less than £9,545,622.00 as a result of DEME's breaches of the Subcontract.

## COUNT I – BREACH OF CONTRACT

76.     JDR repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 75 as if fully set forth herein.

77.     The Subcontract is a valid and enforceable contract between JDR and DEME, governed by the laws of the Commonwealth of Virginia.

78.     JDR performed its obligations under the Subcontract and/or was excused from performance by DEME's breaches and failures.

79.     DEME materially breached the Subcontract in the following respects:

a.  DEME failed to provide JDR with all assistance reasonably required to perform the Termination and Testing Services, including failing to provide timely access to the vessel and Offshore Site, and failing to provide the $H_2S$ risk assessment and confined space classifications necessary for safe execution of the Works.

b.  DEME failed to provide JDR with timely access to the Offshore Site as required for the good and proper performance of the Termination and Testing Services, resulting in extended standby periods.

c.  DEME failed and refused to issue Change Orders for Contractor-caused delays, standby periods, disruption, and additional costs, despite JDR's timely and proper submissions.

d.  DEME failed to issue reasoned determinations on JDR's claims within the required contractual timeframes, failed to certify amounts properly due, and withheld payment in breach of its payment obligations.

e.  DEME unilaterally removed pull-in scope from JDR's Subcontract without following the required Change Order mechanism under Clause 28 and without

contractual justification, thereby depriving JDR of the opportunity to perform work for which it was entitled to compensation under the Subcontract.

f.  DEME's conduct deprived JDR of the fruits of the Subcontract and was undertaken in bad faith to avoid its payment obligations.

80.    As a direct and proximate result of DEME's breaches, including those breaches of the implied covenant of good faith and fair dealing, JDR has suffered damages in an amount to be proven at trial, but which otherwise are not less than JDR presently estimates to exceed £9,545,622.00.

## COUNT II – UNJUST ENRICHMENT

81.    JDR repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 75 as if fully set forth herein.

82.    In the alternative, and to the extent the Subcontract is held not to govern the subject matter of any particular claim, DEME has been unjustly enriched at JDR's expense.

83.    JDR conferred a benefit on DEME by performing standby services, mobilizing personnel and equipment, implementing additional safety measures, absorbing disruption and inefficiency costs, and otherwise expending resources at DEME's direction and for DEME's benefit in connection with the CVOW Project.

84.    DEME has knowledge of and has retained the benefit of JDR's performance without payment therefor.

85.    Under the circumstances, it would be unjust and inequitable for DEME to retain the benefit of JDR's performance without compensating JDR for the reasonable value of its services, personnel, equipment, and resources.

86. The reasonable value of the benefit conferred upon DEME is no less than £9,545,622.00.

## COUNT III – QUANTUM MERUIT

87. JDR repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 75 as if fully set forth herein.

88. In the further alternative, and to the extent the Subcontract is held not to govern the subject matter of any particular claim, JDR performed valuable services for DEME in connection with the CVOW Project, including standby services, additional mobilization and demobilization, implementation of safety measures not contemplated in the original scope, and extended campaign execution necessitated by Contractor-caused delays.

89. JDR performed such services with a reasonable expectation of compensation, and DEME accepted and received the benefit of such services.

90. The reasonable value of the services performed by JDR is no less than £9,545,622.00.

91. DEME has failed and refused to pay JDR the reasonable value of services rendered.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff JDR Cable Systems Limited respectfully requests that this Court enter judgment in its favor and against Defendant DEME Offshore US, LLC, as follows:

A. On Count I (Breach of Contract), compensatory damages in an amount to be determined at trial, but not less than £9,545,622.00;

C. On Count II (Unjust Enrichment), the reasonable value of benefits conferred, in an amount to be determined at trial, but not less than £9,545,622.00;

D. On Count III (Quantum Meruit), the reasonable value of services rendered, in an amount to be determined at trial, but not less than £9,545,622.00;

E. JDR does not seek duplicative recovery, and the damages sought under Counts I through III are pled in the alternative;

F. Pre-judgment interest at the applicable rate from the dates upon which each amount became due and owing;

G. Post-judgment interest at the applicable statutory rate;

H. Attorneys' fees and costs of this action to the extent permitted by contract or law;

I. Such other and further relief as this Court deems just and proper.

Dated: June 8, 2026                                    Respectfully submitted,


/s/ Paul F. Williamson
Paul F. Williamson, VSB No. 94593
Denis Serkin, *Pro Hac Vice* (to be filed)
Peckar & Abramson, P.C.
2055 L Street, NW
Suite 750
Washington, DC 20036
Telephone: (202) 293-8815
Facsimile: (202) 293-7994
pwilliamson@pecklaw.com
dserkin@pecklaw.com


*Attorneys for JDR Cable Systems Limited*